IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSHUA PROLENSKI and DENNIS PACELEY, on behalf of themselves and all others similarly situated, | CIVIL ACTION NO. ERISA CLASS ACTION |
| Plaintiffs, | |
| v. | |
| UNITED STATES STEEL CORPORATION, TRANSTAR, LLC, GARY RAILWAY COMPANY, and UNION RAILROAD COMPANY, LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Joshua Prolenski and Dennis Paceley, on behalf of themselves and all others similarly situated, file this action pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) for violations of the Employee Retirement Income Security Act ("ERISA" – 29 U.S.C. §§ 1991 et seq.) committed by United States Steel Corporation, Transtar, LLC, Union Railroad Company, LLC, and Gary Railway Company (collectively "U.S. Steel Defendants").

## PRELIMINARY STATEMENT

1.     In 2013, the U.S. Steel Defendants created and implemented a discriminatory scheme which targeted employees who were participants of the United States Steel Corporation Plan for Employee Pension Benefits (Revision of 2003) ("Carnegie Pension").

2.     The scheme was part of a plan known as the Carnegie Way, which was a grand attempt by the U.S. Steel Defendants to transform the companies during a downturn in the steel industry.

3.      The Carnegie Way has since become the focus of numerous lawsuits, all of which depict the plan as nothing more than a charade.

4.      It now appears that the Carnegie Way was simply a cover for extreme, cost-cutting measures which allowed the U.S. Steel Defendants to reduce debt and expenses by any means possible.

5.      This action focuses on the U.S. Steel Defendants' attempt to reduce the companies' pension obligations by systematically and illegally eliminating participants of the Carnegie Pension.

**THE PARTIES**

6.      Plaintiff Joshua Prolenski is an adult individual who resides in West Mifflin, Pennsylvania.

7.      Plaintiff Dennis Paceley is an adult individual who resides in Portage, Indiana.

8.      Defendant United States Steel Corporation ("U.S. Steel") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Pittsburgh, Pennsylvania.

9.      Defendant Transtar, LLC ("Transtar"), is a holding company organized as a corporation and existing under the laws of the State of Delaware with its principal place of business located in Pittsburgh, Pennsylvania.

10.      Transtar is comprised of seven railroad entities: Delray Connecting Railroad Company, Fairfield Southern Company, Gary Railway Company, Lorain Northern Company, Texas & Northern Railway Company, The Lake Terminal Railroad Company, and Union Railroad Company.

11.     As part of its operations, Transtar exerts influence and controls the day-to-day operations of the seven railroad companies listed above. Transtar also provides human resources services to the seven railroad companies from its headquarters located in Pittsburgh, Pennsylvania.

12.     Defendant Union Railroad Company, LLC ("Union Railroad") is a corporation organized and existing under the laws of the State of Delaware and shares the same principal place of business as Transtar in Pittsburgh, Pennsylvania.

13.     Defendant Gary Railway Company ("Gary Railway") is a corporation organized and existing under the laws of the State of Delaware. Gary Railway has listed a Pittsburgh, Pennsylvania address used by Transtar and Union Railroad as its principal place of business in the articles of incorporation it filed with the Indiana Secretary of State.

14.     At all relevant times, the Carnegie Pension was administered and maintained by the U.S. Steel Defendants and was an employee benefit plan as defined by ERISA.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Plaintiffs' claims arise under the laws of the United States and Plaintiffs seeks redress for violations of federal laws.

16.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that it is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)(2) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred at the headquarters of U.S. Steel and Transtar, which are located in this district.

## FACTUAL BACKGROUND

**A.    The Carnegie Pension was created to
reward, not punish, long-tenured employees**

History of the Carnegie Pension

18.    The Carnegie Pension originated in 1901 as the Carnegie Relief Fund when Andrew Carnegie made a $4 million contribution "to provide small pensions or aids to such employees as, after long and creditable service, through exceptional circumstances, need such help in their old age and who make good use of it."

19.    U.S. Steel joined the Carnegie Relief Fund in 1911. Three years later, the fund was incorporated as the U.S. Steel & Carnegie Pension Fund.

20.    The pension's benefit plan became defined after 1914. In 1950, U.S. Steel agreed that the pension's defined benefit plan should be collectively bargained for and the framework for the Carnegie Pension that exists now was formed.

21.    Andrew Carnegie stated that the Carnegie Pension was his "acknowledgement of the deep debt which I owe to the workers who have contributed so greatly to my success."

22.    To this day, the purpose of the Carnegie Pension remains the same: repaying employees for the years of service they provided to the companies.

The expansive and generous benefits of the Carnegie Pension

23.    The Carnegie Pension is a defined-benefit plan sponsored by U.S. Steel. Participants of the Carnegie Pension include and have included employees of U.S. Steel, Transtar, Gary Railway, and Union Railroad.

24.    The Carnegie Pension benefits are largely determined by an employee's age and years of service to U.S. Steel or one of the companies it owns and operates.

25.     There are numerous benefit provisions for participants in the Carnegie Pension, including: Normal or Full Retirement, Early Retirement, Disability Retirement, 62/15 Retirement, 30-year Retirement, 60/15 Retirement, 70/80 Retirement, Rule-of-65 Retirement, Permanent Incapacity Retirement, and Deferred Vested Retirement.

26.     To qualify for one of the Carnegie Pension's benefit provisions, a participant needs to have worked at least 5 continuous years and be 40 years of age or older.

27.     Survivor benefits are available to the spouse of any Carnegie Pension participant who works for 5 continuous years, regardless of age.

28.     Generally, the Carnegie Pension rewards years of service, and the longer an employee works, the higher their pension payments become if the minimum continuous service requirements are met.

29.     The Carnegie Pension's continuous service requirements are not met if an employee is discharged, for any reason, and not rehired within a one-year period following their discharge.

30.     Participants who vest in the Carnegie Pension are eligible to receive a special payment (e.g., vacation day payout) and a pension that is payable in monthly installments.

31.     The pension's monthly installment payments are often determined by the participant's average monthly earnings. For participants who achieve the Normal or Full Retirement, monthly installment payments can exceed 1.33 times the average monthly compensation they received as an employee.

32.     All U.S. Steel employees were once eligible for the Carnegie Pension. That, however, changed after U.S. Steel lost its foothold in the steel industry and began to view experienced employees with pensions as looming liabilities rather than valued assets.

**B.    U.S. Steel's integrated steelmaking model and
        its centralized control over all its lines of business**

33.    U.S. Steel was founded in 1901, and at one time, was the largest corporation in the world and the largest steel producer.

34.    Today, U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe. U.S. Steel supplies customers throughout the world, primarily in the automotive, consumer, industrial, and oil country tubular goods markets.

35.    As an integrated steel producer, U.S. Steel owns and operates numerous lines of business as part of its steel-production operations. One of the business lines that U.S. Steel owns and operates is railroad transportation.

36.    Railroad operations are vital to U.S. Steel's core business as the company uses its railways to transports raw materials; provide in-plant transportation and movement of semifinished steel; and move finished product to its destination.

37.    The following companies comprise U.S. Steel's railroad transportation business: Delray Connecting Railroad Company, Fairfield Southern Company, Gary Railway Company, Lorain Northern Company, Texas & Northern Railway Company, The Lake Terminal Railroad Company, and Union Railroad Company.

38.    In 1988, U.S. Steel created Transtar as a holding company for its railroad transportation business.

39.    As noted on Transtar's own website, the creation of Transtar was simply part of a financial restructuring plan by U.S. Steel.

40.    Transtar is wholly owned by U.S. Steel and the legal reorganization of the companies did not change the way U.S. Steel's railroad transportation business operated.

41.    U.S. Steel continues to exhibit significant control over Transtar and its affiliated companies, which is reflected in the 10-K Reports that U.S. Steel filed form 2011-2014:

> "U. S. Steel owns the Gary Railway Company in Indiana; Lake Terminal Railroad Company and Lorain Northern Company in Ohio; Union Railroad Company in Pennsylvania; Fairfield Southern Company, Inc. located in Alabama; Delray Connecting Railroad Company in Michigan and Texas & Northern Railroad Company in Texas; all of which comprise U. S. Steel's transportation business." [emphasis added]

42.    From 2015-2018, U.S. Steel wrote a substantially similar description about its railroad operations in its 10-K Report:

> "U. S. Steel owns the Gary Railway Company in Indiana, Lake Terminal Railroad Company and Lorain Northern Company in Ohio, Union Railroad Company, LLC in Pennsylvania, Fairfield Southern Company, Inc. in Alabama, Delray Connecting Railroad Company in Michigan and Texas & Northern Railroad Company in Texas. These entities comprise U. S. Steel's transportation business." [emphasis added]

43.    It was not until U.S. Steel's 2019 10-K Report that the company adjusted its description of its transportation business, stating "U. S. Steel owns the following railroads through its transportation subsidiary, Transtar…"

44.    Despite the change in phrasing in U.S. Steel's 2019 10-K Report, U.S. Steel continued to make decisions which directly impacted the terms and conditions of employment for all individuals who worked in its railroad transportation business, which included employees of Transtar, Gary Railway, and Union Railroad.

**C.    Downturn in the steel industry and its impact on the U.S. Steel Defendants**

Years of consecutive losses results in extreme cost-cutting measures

45.    In 2013, U.S. Steel Chief Executive Officer, Mario Longhi, hired David Burritt as Executive Vice President and Chief Financial Officer "with responsibility for all aspects of the company's strategic and financial matters."

46.    Longhi and Burritt devised a plan with consultants from McKinsey & Company called the "Carnegie Way."

47.    U.S. Steel touted the Carnegie Way initiative as "much more than a cost cutting initiative, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

48.    Today, the Carnegie Way plan is the focus of numerous shareholder derivative lawsuits which call Longhi's and Burritt's plan a sham and nothing more than a cost-cutting crusade.

49.    Former employees of the U.S. Steel Defendants, as identified as confidential witnesses in the aforementioned shareholder derivative lawsuits, have recently stated that as steel prices and manufacturing demand dropped in 2014, the Carnegie Way focused solely on cutting costs.

50.    Upon information and belief, there have been allegations made that McKinsey & Company urged managers to reduce any expense that could be isolated and measured. Bob Tita and Kris Maher, U.S. Steel, the Company That Built America, Faces Its Age, Wall Street Journal, December 15, 2019, 3:50pm, https://www.wsj.com/articles/u-s-steel-the-company-that-built-america-faces-its-age-11576443004.

51.    Managers throughout all of U.S. Steel's lines of business were required to come up with ideas for lowering expenses. See Id.

52.    The cost-cutting directives came from U.S. Steel's headquarters and urged the steel plants to get as much cost savings as possible. See Amended Complaint at ¶ 105 (Doc. No. 55) at 2:17-cv-00579, Varakas v. U.S. Steel Corp. et al, in the United States District Court of the

Western District of Pennsylvania (Vrakas is one of the aforementioned shareholder derivative lawsuits).

53.    In 2015, the collapse of the steel industry resulted in the U.S. Steel Defendants enacting extreme cost-cutting measures under the guise of the Carnegie Way, which included paring down debt, enacting massive layoffs, and reducing U.S. Steel's pension obligations.

54.    As noted in the Vrakas Amended Complaint, individuals observed that during this period that if an employee was highly paid and had been with U.S. Steel for many years, the Company would find a way to "get rid" of them. Other individuals noted that U.S. Steel had a practice of getting rid of experienced, highly paid personnel and replacing them with inexperienced workers. See Id. at ¶ 128.

Carnegie Pension's obligations weigh heavily on the U.S. Steel Defendants

55.    One of the most obvious and measurable expenses for U.S. Steel to cut during its financial difficulties was its obligations to the Carnegie Pension.

56.    From 2011-2014, U.S. Steel wrote in its 10-K Reports that the "[pension plan costs] create a competitive disadvantage and negatively affect our results of operations and cash flows."

57.    In 2014, U.S. Steel stated in its 10-K Report that one of the key issues impacting U.S. Steel was "the level of unfunded pension and other benefit obligations."

58.    From 2011-2016, the Carnegie Pension was underfunded at an average level of $1.24 billion.

59.    To meet its funding obligations under ERISA, U.S. Steel contributed hundreds of millions of dollars each year to the Carnegie Pension. Meeting these funding obligations created a financial drain for the U.S. Steel Defendants.

60.    As such, it became critical for the U.S. Steel Defendants to reduce its Carnegie Pension obligations. The U.S. Steel Defendants started by reducing the number of participants in the Carnegie Pension.

**D.    Targeting of Carnegie Pension participants
as part of the Carnegie Way's extreme cost-cutting measures**

61.    Carnegie Pension participants were employed throughout U.S. Steel's operations, including at Transtar, Gary Railway and Union Railroad.

62.    At the start of 2013, there were 77,452 participants in the Carnegie Pension. Once the Carnegie Way was implemented, the number of participants was dramatically reduced to 51,800 (as reported in U.S. Steel's Form 5500 filed with the U.S. Department of Labor in 2019).

63.    In 2013, as part of the Carnegie Way's cost-cutting measures, managers at Transtar, Gary Railway, and Union Railroad began to target employees who were participants in the Carnegie Pension in the following ways:

>    a.    Terminating the employment of Carnegie Pension participants without following the applicable written disciplinary policies;
>
>    b.    Manipulating the applicable disciplinary policies to ensure that Carnegie Pension participants were issued a disproportionately higher number of demerits for the same or similar infractions that were committed by non-Carnegie Pension participants;
>
>    c.    Removing Carnegie Pension participants from service by issuing them more than 60 demerits (or more) for a single infraction that would typically be handled through verbal counseling or an informal warning;
>
>    d.    Forcing Carnegie Pension participants to sign "last chance" agreements to ensure that procedural protections contained within applicable collective bargaining agreements and other contracts could not be raised by those Carnegie Pension participants; and/or
>
>    e.    Failing to remove prior demerits from the files of Carnegie Pension participants in a timely manner.

64.     These discriminatory, cost-cutting measures were controlled by U.S. Steel and Transtar executives and implemented on the ground by managers at Gary Railway, Union Railroad, and other Transtar-related companies.

65.     These discriminatory, cost-cutting measures were devised by U.S. Steel and Transtar executives to help Gary Railway, Union Railroad, and other Transtar-related companies by allowing those companies to avoid cutting expenses in other areas that might impact operations in a more harmful way.

66.     Carnes was Managing Director of U.S. Steel Logistics and General Manager of Transtar during the relevant period of these claims. Carnes is now listed as "CEO of Transtar and President of the Transtar Companies."

67.     Sommers was Managing Director of U.S. Steel Logistics and President of Transtar during the relevant period of these claims. Sommers is now listed as Vice President of Process and Innovation for U.S. Steel.

68.     It is believed that Burritt, Jonathan Carnes, and Malissa Sommers were among the U.S. Steel executives who helped to create and implement the Carnegie Way's cost-cutting measures that targeted Carnegie Pension participants at Gary Railway, Union Railroad, and at other companies controlled by U.S. Steel and/or Transtar.

69.     It is believed that Carnes, Sommers, and other U.S. Steel and Transtar executives targeted specific Carnegie Pension participants for firing. These executives would rely on the General Superintendents of Gary Railway, Union Railroad, and other Transtar-related companies, to carry out these firings. At Gary Railway, the relevant General Superintendents were Nicholas Babich and Bradley Belshaw.  At Union Railroad, it was Joel Hudson.

11

70.    These General Superintendents carried out the Carnegie Way plan in similar ways. During weekly meetings, specific employees were discussed, and the General Superintendents assigned supervisors the responsibility of monitoring those targeted employees. The emphasis of these monitoring assignments was not to increase productivity, ensure safety, or otherwise improve the day-to-day performance of the companies, but rather, to find incidents where demerits could be assigned.

71.    Monitoring of Carnegie Pension participants involved surreptitious, around-the-clock-surveillance. For example, supervisors would often hide behind objects and monitor the targeted employees from a distance or at night. In other instances, supervisors would continually follow Carnegie Pension participants in company-issued trucks.

72.    Almost any incident could serve as the basis for issuing demerits. If demerit-incident occurred, the targeted employee was immediately removed from service and pressured into signing a last chance agreement so that they would forfeit the use of any available grievance process. If the targeted employee refused to sign a last chance agreement, any exculpatory evidence that existed was often destroyed or go missing whenever a grievance hearing was held.

Dennis Paceley's targeting and firing due to his status as a Carnegie Pension member

73.    On May 7, 2007, Paceley was hired as a Trainman by Gary Railway. Within a year, Paceley also became a Remote Control Operator ("RCO").

74.    On May 7, 2008, Paceley became a participant in the Carnegie Pension.

75.    Paceley performed all the essential job duties of a Trainman and RCO and performed them well. However, during the 2013-2014 period, it is believed that Paceley was targeted as part of the Carnegie Way plan and was issued demerits for incidents that non-Carnegie Pension employees would never have received.

76.    Following these incidents, Paceley cleared his record and continued to perform his job duties as Trainman and RCO well. However, Paceley continued to be monitored and surveilled in a way that differed from employees who were not participants of the Carnegie Pension.

77.    On November 20, 2019, Paceley was involved in an incident which resulted in the issuance of 60 demerits. Following the incident, Gary Railway sought the termination of Paceley's employment.

78.    In response, Paceley pointed out that other employees – non-Carnegie Pension participants – who were accused of substantially similar rules violations were not issued 60 demerits. Paceley also noted that the company relied on misstatements of existing operating procedures when issuing him the 60 demerits. Finally, Paceley proved that the company used staged photographs of the incident as a basis for issuing the 60 demerits. Despite these rebuttals, Paceley's employment with Gary Railway was terminated on January 22, 2020.

79.    At the time of his firing, Paceley was 57 years old, had been employed by Gary Railway for nearly 12 years, and was approaching a significant vesting period under the Carnegie Pension.

Joshua Prolenski's targeting and firing due to his status as a Carnegie Pension member

80.    On April 4, 2014, Prolenski was hired as a Trainman by Union Railroad.

81.    On April 4, 2015, Prolenski became a participant in the Carnegie Pension.

82.    Prolenski performed all the essential job duties of a Trainman and performed them well.

83.    In 2016, Prolenski's wife was diagnosed with cancer and Prolenski notified Union Railroad about this development.

84.     The officials at Union Railroad repeatedly told Prolenski that he did not have to apply for caregiver leave under the FMLA, and instead, told Prolenski to informally take time off whenever he had to take care of his wife.

85.     As such, Prolenski would notify his immediate supervisor whenever he needed to be late to work when taking care of his wife. Despite this arrangement, Prolenski was written up on two occasions for being late to work and issued a total of 100 demerits.

86.     Employees who were not participants in the Carnegie Pension were never issued a similar number of demerits for being late to work.

87.     In May 2018, Prolenski was diagnosed with cancer. Prolenski immediately applied for and was approved for FMLA leave.

88.     During Prolenski's FMLA leave, the company implemented a new brake test. Approximately a month after Prolenski returned to work, he was assessed the new brake test and was told that he failed the test.

89.     Prolenski notified Union Railroad officials that the engine cameras would show that he did not actually fail the new brake test.

90.     Prolenski also told management that the engineer he was working with would also testify that he did not fail the brake test.

91.     Finally, the manager who initially cited Prolenski for the brake test failure recanted and offered to testify on Prolenski's behalf.

92.     Despite the availability of all this evidence, Union Railroad persisted in its decision to fire Prolenski.

93.     Prolenski eventually received a letter that was dated April 23, 2019, notifying him that he was fired.

94.    At the time of his firing, Prolenski was 38 years old, had been employed by Union Railroad for over 5 years, and was approaching his initial vesting period under the Carnegie Pension.

Concealing the scheme that targeted the Carnegie Pension participants

95.    The U.S. Steel Defendants took action to ensure that all evidence of their discriminatory scheme to target Carnegie Pension participants would never be uncovered.

96.    The U.S. Steel Defendants began by manipulating existing disciplinary rules so that Carnegie Pension participants could be fired within the existing framework of applicable rules and procedures. For example, the use of last chance agreements was specifically and contractually limited to employees with substance abuse problems. Instead, the U.S. Steel Defendants began to use the last chance agreements to target Carnegie Pension participants.

97.    By using last chance agreements, the U.S. Steel Defendants had no obligation to preserve any documentation or exculpatory evidence before a Carnegie Pension participant was fired.

98.    Even when last chance agreements were not used, the U.S. Steel Defendants failed to preserve or even destroyed exculpatory evidence that could have prevented a Carnegie Pension participant from being fired. As noted above, there were even instances in which the U.S. Steel Defendants manufactured inculpatory evidence to justify the firing of a Carnegie Pension participant.

99.    Next, the U.S. Steel Defendants worked with, pressured, and/or incentivized certain union leaders to dissuade their members not to pursue legal claims. On numerous occasions, whenever a Carnegie Pension participant was taken out of service, they were required to meet with a General Superintendent and other company managers. During those meetings, a

union representative was present but often stayed silent while the company representative berated the Carnegie Pension participant and attempted to dissuade them from exercising their legal rights.

100.    Even when Carnegie Pension participants raised these and other issues with their respective unions, they were either told they had no legal recourse or denied any assistance.

101.    The unions also failed to apprise Carnegie Pension participants of potential statute of limitations issues, and there were numerous instances in which legal representatives of these unions told Carnegie Pension participants that they had no legal claims.

102.    To this day, there are an untold number of individuals who are unaware that their employment with one of the U.S. Steel Defendants ended because they were Carnegie Pension participants.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other employees of the U.S. Steel Defendants whose employment was terminated because of their status as participants of the Carnegie Pension.

104.    The U.S. Steel Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making a class-wide ERISA action the appropriate remedies for the Class.

105.    While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds of former employees of Transtar, Gary Railway, and Union Railroad who were discharged, fined, suspended, expelled, disciplined, or discriminated against because of their status as participants of the Carnegie Pension.

16

106.    Plaintiffs' claims are typical of those members of the Class, as all members were discharged, disciplined, and/or discriminated against because they were participants of the Carnegie Pension. Accordingly, the defenses available to the representative claims raised by the Plaintiffs will also be typical to the Class.

107.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

    a.    Whether the Carnegie Pension qualifies as an employee benefit plan under ERISA;

    b.    Whether U.S. Steel acted indirectly in the interest of Gary Railway, Union Railroad, and other Transtar-related companies;

    c.    Whether Transtar acted indirectly in the interest of Gary Railway, Union Railroad, and other companies affiliated with the Transtar name;

    d.    Whether the U.S. Steel Defendants terminated Plaintiffs' and other Class members' employment for the purpose of interfering with their attainment of vesting benefit options under the Carnegie Pension;

    e.    Whether Plaintiffs' and other Class members' employment was terminated for legitimate and non-discriminatory reasons.

108.    Plaintiffs will fairly and adequately protect the interests of Class. Plaintiffs have retained counsel who are competent and experienced in class action litigation and with adequate resources to assure the interests of the Class are protected.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable and common questions of law and fact predominate over any individual questions affecting only individual members. A class action will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of

effort and expense that numerous individual actions would entail. There will be no difficulty in the management of this action as a class action.

110.    The Class members are ascertainable because every potential Class member can be identified from the U.S. Steel Defendants' regularly maintained employee personnel records and/or pension fund records. Accordingly, a review of the U.S. Steel Defendants' records maintained in the ordinary course of business is all that is necessary to determine members of this Class.

## STATEMENT OF CLAIMS

### COUNT I
Violations of ERISA by US Steel, Transtar, and Union Railroad
(On Behalf of Plaintiff Joshua Prolenski and Similarly Situated Individuals)

111.    Plaintiffs incorporates by reference the allegations in Paragraphs 1 through 110, as if fully set forth herein.

112.    The Carnegie Pension qualifies as an employee benefit plan under ERISA.

113.    Plaintiff Joshua Prolenski and other employees at Union Railroad were participants of the Carnegie Pension.

114.    Plaintiff Joshua Prolenski and other Carnegie Pension participants at Union Railroad were discharged, disciplined, and/or discriminated against because of their status as participants of the Carnegie Pension

115.    The acts and omissions by Defendants U.S. Steel, Transtar, and Union Railroad that are described in this Complaint constitute violations of Section 510 of ERISA.

116.    As a proximate result of the conduct by Defendants U.S. Steel, Transtar, and Railroad, Plaintiff Joshua Prolenski and other similarly situated individuals have or will suffer

substantial harm, for which they seek the benefits due to them under the terms of Carnegie

Pension, along with all other appropriate equitable relief to which they are entitled.

## COUNT II
Violations of ERISA by US Steel, Transtar, and Gary Railway
(On Behalf of Plaintiff Dennis Paceley and Similarly Situated Individuals)

117.    Plaintiffs incorporates by reference the allegations in Paragraphs 1 through 116,

as if fully set forth herein.

118.    The Carnegie Pension qualifies as an employee benefit plan under ERISA.

119.    Plaintiff Dennis Paceley and other employees at Gary Railway were participants

of the Carnegie Pension.

120.    Plaintiff Dennis Paceley and other Carnegie Pension participants at Gary Railway

were discharged, disciplined, and/or discriminated against because of their status as participants

of the Carnegie Pension

121.    The acts and omissions by Defendants U.S. Steel, Transtar, and Gary Railway that

are described in this Complaint constitute violations of Section 510 of ERISA.

122.    As a proximate result of the conduct by Defendants U.S. Steel, Transtar, and Gary

Railway, Plaintiff Dennis Paceley and other similarly situated individuals have or will suffer

substantial harm, for which they seek the benefits due to them under the terms of Carnegie

Pension, along with all other appropriate equitable relief to which they are entitled.

## **<u>REQUESTS FOR RELIEF</u>**

Accordingly, Plaintiffs requests that this Court enter judgment, on their behalf and on behalf of all other similarly situated individuals, and enter an order directing the award of other relief, as follows:

A. Declaring this action to be class action properly maintained under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as the Class representatives;

B. Entering an order requiring the U.S. Steel Defendants to provide Plaintiffs with the names, dates of birth, length of employment, and last known contact information, including physical addresses, e-mail addresses, and telephone numbers of all former Carnegie Pension participants whose employment ended from 2013 to present;

C. Entering an order directing that notice and opportunity to opt-in be given to all former employees of the U.S. Steel Defendants who were Carnegie Pension Participants and whose employment ended from 2013 to present;

D. Finding that the U.S. Steel Defendants violated ERISA;

E. Awarding Plaintiffs and other similarly situated employees reinstatement, back pay, benefits due to them under the Carnegie Pension had their employment not been terminated, and other emoluments of employment and such other relief as is necessary to make them whole;

F. Awarding Plaintiff, and all other similarly situated individuals, attorneys' fees and costs;

G. Awarding Plaintiff and other similarly situated individuals pre- and post-judgment interest as provided by law; and

H. Awarding Plaintiff and other similarly situated individuals any other relief to which they are entitled and/or which this Court deems necessary and proper.

A jury trial is demanded for all claims triable by jury

Respectfully submitted,

/s/ Sammy Y. Sugiura
Sammy Y. Sugiura
PA I.D. No. 209942
ssugiura@cohengrace.com
COHEN & GRACE, LLC
105 BRAUNLICH DRIVE
SUITE 300
PITTSBURGH, PA 15237
TELEPHONE: (412) 847-0300
FACSIMILE: (412) 847-0304

**COUNSEL FOR PLAINTIFF**